FILED

2008 DEC 15 PM 12: 35

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR NO. 08- **CR 08 01443** |
| Plaintiff, | **I N F O R M A T I O N** |
| v. | [18 U.S.C. § 371: Conspiracy] |
| GARY A. RAY, | |
| Defendant. | |

The United States Attorney charges:

**COUNT ONE**

[18 U.S.C. § 371]

[Conspiracy]

I.   **BACKGROUND**

1.   KB Home ("KB") is a homebuilding company that was founded in 1957.  KB is a Delaware corporation headquartered in Los Angeles. KB is currently a Fortune 500 company, trading on the New York Stock Exchange as "KBH."

2.    At all times relevant to the Information, defendant GARY A. RAY ("defendant RAY") served as KB's Senior Vice-President of Human Resources ("HR") and was a corporate officer governed by Section 16 of the Securities Exchange Act of 1934.

3.    At all times relevant to this Information, KB's Chief Executive Officer and Chairman of the Board of Directors ("the CEO") was a corporate officer governed by Section 16 of the Securities Exchange Act of 1934.

4.    From 1999 to 2005, the CEO and defendant RAY managed KB's executive compensation process, particularly as it related to stock options.  Each year, they both briefed KB's Compensation Committee ("Committee") on the amount of stock options to be issued to KB's employees, recommending a specific number of options for each high-ranking KB executive and a lump sum number of options for the lower-level rank and file employees.  Both the CEO and defendant RAY were recipients of KB's annual stock option grants during this time period, with the CEO routinely receiving approximately one-half of the total number of options granted to high-ranking KB executives.

5.    From 1999 to 2001, the three-year period immediately preceding the implementation of the Sarbanes-Oxley Act of 2002 ("SOX"), defendant RAY and the CEO would backdate the grant date for KB's annual stock options.  Specifically, they would wait for a period of approximately six weeks after the Committee's annual option grant meeting in early October and then "look back" approximately six weeks, proceeding as far back as the date of the Committee meeting, in order to select a grant date for the annual stock options to be issued to KB's employees.  The date selected by the CEO and defendant RAY was the date on which KB's closing stock

price was at its lowest point during the relevant time period, that is, between the early October Committee date and the mid-November date from which they looked back.  The exercise price for KB's annual stock option grants was the closing price of KB's stock on the date retrospectively selected by the CEO and defendant RAY to serve as the grant date of the options.

6.   By selecting the grant date for KB's annual stock option grants retrospectively in this manner, the CEO and defendant RAY secured exercise prices for KB's options significantly lower than the fair market value ("FMV") of KB's stock on the day they picked the grant date.  At the same time, by linking the exercise price of KB's annual options to the closing price of KB's stock on grant date they selected with hindsight, the CEO and defendant RAY created the false and misleading impression that the exercise price of KB's annual stock options was the FMV of KB's stock "as of" the date the options were actually granted.

7.   After SOX's passage in 2002, the CEO and defendant RAY modified their retrospective pricing process to deal with SOX's 48-hour reporting requirement for Form 4s, which required the reporting of equity awards to Section 16 officers within 48 hours of the date of the award.  Instead of looking back to the lowest point in a prior six week time period, they started using a two-day rolling window to select a low grant price.  Using this method, the CEO and defendant RAY would routinely monitor fluctuations in KB's stock during the month of October on a going-forward basis and, after concluding they had found the likely lowest price trough during this period, they would look back either one or two days to select the

3

grant date with the lowest price within this floating two-day window.

8.   The purpose of this modified hindsight pricing process remained the same as that of the CEO's and defendant RAY's pre-SOX process, namely, to price KB's annual option grants below the FMV of KB's stock at the time of the option grant by selecting earlier grant dates with lower closing prices, while at the same time creating the misleading impression that the exercise price of KB's stock options was the FMV of KB's stock "as of" the date the options were actually granted.

9.   At no time did the CEO or defendant RAY disclose their adoption of the procedure of using retrospective pricing to select favorably-low, historical grant dates to KB's Committee, Accounting and/or Tax Departments, to KB's shareholders, or to KB's outside auditors.

## II.   <u>OBJECT OF THE CONSPIRACY</u>

10.   Beginning as early as around mid-March 2006 and continuing to around mid-August 2006, within the Central District of California and elsewhere, the CEO and defendant RAY, together with others known and unknown to the United States Attorney, knowingly combined, conspired, and agreed to commit the following offense:

Knowingly altering, destroying, mutilating, concealing, covering up, falsifying and making a false entry in a record, document and tangible object, namely a report on KB's historical stock option-granting process submitted to KB's Audit Committee, in contemplation of an investigation by the Securities and Exchange Commission ("SEC") into stock option backdating at KB, with the intent to impede, obstruct or influence such a contemplated SEC

investigation, which is a matter within the jurisdiction of the SEC, an agency of the United States, in violation of Title 18, United States Code, Section 1519.

III.  **MANNER AND MEANS OF THE CONSPIRACY**

11.  The object of the conspiracy was carried out, in substance, in the following manner and by the following means, among others, as set forth below.

KB Home's Internal Investigation

12.  Beginning in March of 2006, the Wall Street Journal ("WSJ") and other newspapers began writing stories about options backdating scandals occurring at various publicly-traded companies. These articles generally explained, among other things, that backdated options created certain accounting and tax consequences for companies.  In addition, many of these articles disclosed that various federal agencies, including the SEC and the Department of Justice ("DOJ"), were investigating various companies for options backdating and for causing inaccurate reporting statements, such as annual Form 10Ks and quarterly 10Qs, to be filed with the SEC.

13.  Toward the end of May 2006, the head of KB's Audit Committee contacted KB's CEO and requested an internal investigation into whether KB's options granting process was subject to any irregularities.  It was understood by the CEO and defendant RAY that any results from this investigation were to be delivered to the Audit Committee, and that these results were likely to be taken into account by KB's Board and KB's management in determining whether any public disclosures with the SEC regarding irregularities in KB's options granting practices were required.

14.   KB's Chief Legal Counsel ("CLO") conducted this internal investigation.  When investigating KB's historical options practices, the CLO sought information from both defendant RAY and the CEO.  The CLO requested documents from defendant RAY, and asked both defendant RAY and the CEO to submit to a series of interviews concerning KB's stock options process.

15.   Before the CEO and defendant RAY interviewed with the CLO on or about May 30, 2006, the CEO indicated to defendant RAY that their prior backdating practices could not be revealed to the CLO. The CEO and defendant RAY both agreed that if this internal investigation was not controlled, it could evolve into an independent investigation that could possibly lead to, among others things, an SEC investigation, a consequence that had already been publicly reported at a number of other companies.  Therefore, the CEO and defendant RAY jointly developed an "innocent," and inaccurate, explanation for the stock option grant process that did not disclose the CEO's and defendant RAY's retrospective pricing practices.

16.   In May and June of 2006, the CEO and defendant RAY made statements to the CLO about KB's stock option grant process.  When the CEO and defendant RAY described the stock option grant process to the CLO, they made a series of false statements.  Both men falsely denied ever pricing stock options with hindsight or otherwise manipulating the option-granting process to secure favorably low exercise prices for KB's annual option grants.  In fact, the CEO and defendant RAY told the CLO that the stock options were priced only after they determined how the block of stock options awarded by the Committee for a given year to the lower-level

KB employees would be allocated to these employees, a process otherwise known as the "allocation process." The CEO and defendant RAY also falsely stated that, after this allocation process was completed, the grant dates were mechanically determined on a going forward basis, either immediately or within a relatively short window of time.

17. Both the CEO and defendant RAY knew that the statements they provided to KB's CLO were false in that the selection of grant dates for the stock options was wholly price-driven, based on their use of hindsight to pick low price points for KB's stock, and had nothing to do with completing the allocation process. KB's CLO relied substantially on these false interview statements from the CEO and defendant RAY in drafting his investigative report, and both the CEO and defendant RAY knew that KB's CLO's report was based in large measure on their false account of KB's option-granting process.

18. When writing his investigative report, KB's CLO sent drafts for defendant RAY and KB's CEO to review. Neither the CEO nor defendant RAY corrected the false statements in the report. When the final report was completed, it stated categorically that there was no backdating at KB and that historically low grant prices were the result of an essentially price-neutral, administrative process, not the result of any inappropriate cherry-picking of historically low grant dates.

19. KB's CEO and defendant RAY also did not disclose to KB's CLO that they had never sought or received authorization from the Committee to select option grant dates through the use of hindsight

pricing, and that they had never briefed the Committee on the manner in which they selected the grant dates for KB's annual options.

20. The CLO's report was submitted to KB's Audit Committee, which in reliance on it and in consultation with the Chief Financial Officer ("CFO"), the Chief Accounting Officer ("CAO"), and the CEO, decided that there was no serious backdating issue at KB. In reliance on the CLO's inaccurate report and in consultation with the CFO and CAO, KB filed a 2nd Quarter Form 10Q with the SEC on July 7, 2007 that did not disclose any backdating problems affecting the company.

21. Based upon the CLO's report, both KB's Audit Committee members and KB's outside auditor believed that KB was not required to make any disclosure about its internal investigation or the fact that KB may have repeatedly reported inaccurate information about its stock-option equity awards in previously-filed 10Ks and 10Qs. Accordingly, the Audit Committee, the CLO and the CFO concurred with the filing with the SEC of the second quarter Form 10Q, based on the misleading facts in the CLO's report. In fact, the CFO certified the accuracy of the information contained in KB's July 2006 quarterly 10Q filing with the SEC, as he was required to do under SOX, based in significant measure upon his belief in the accuracy of the CLO's report.

/ /

/ /

/ /

/ /

## IV.   OVERT ACTS

22.   In furtherance of the conspiracy and to accomplish its objects, defendant RAY and the CEO, together with other co-conspirators known and unknown to the United States Attorney, committed and caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

**Overt Act No. 1**: On or about May 24, 2006, in response to an inquiry from an outside stock analyst about KB's option grant procedures, defendant RAY instructed an HR employee to falsely and misleadingly state that KB's Compensation Committee approved the number and timing of KB's annual option awards.

**Overt Act No. 2:** In the last week of May 2006, the CEO instructed defendant RAY that, in responding to backdating inquiries from KB's CLO, defendant RAY needed to emphasize that management's selection of grant dates was based on a price-neutral administrative process and did not involve gaming or manipulation to secure low exercise prices.

**Overt Act No. 3**: Around the end of May 2006, the CEO falsely assured KB's CLO that management did not backdate or otherwise manipulate the stock option granting process at KB.

**Overt Act No. 4**: Around the end of May 2006, defendant RAY falsely informed KB's CLO that management's selection of the grant date was dependent upon the completion of the allocation process to lower-level KB employees and that management did not backdate or otherwise manipulate stock option grants.

**Overt Act No. 5**: On or about June 9, 2006, defendant RAY falsely assured KB's CLO and CAO that "it is crystal clear that we did not go backwards in selecting our dates."

1         **Overt Act No. 6**: At a meeting on June 12, 2006, the CEO

2 instructed KB's CLO to make more definitive his conclusion that KB's

3 historical option granting process did not involve any manipulation

4 or impropriety on the part of management.

5         **Overt Act No. 7**: On or about June 14, 2006, the CEO

6 attended a meeting of KB's Audit Committee and remained silent while

7 the Chairman of the Audit Committee summarized the findings of KB's

8 CLO's investigation into KB's stock option process.

9         **Overt Act No. 8**: On or about June 30, 2006, in a meeting

10 with KB's management and members of the Audit Committee, the CEO

11 disparaged the memorandum prepared by KB's outside counsel, which

12 was critical of the findings of KB's CLO that there was no

13 backdating at KB.

14         **Overt Act No. 9**: On or about June 30, 2006, in a meeting

15 with KB's management and members of the Audit Committee, the CEO

16 remained silent while KB's CLO presented the findings of his

17 internal investigation concluding that there was no backdating or

18 other manipulation of stock options at KB.

19         **Overt Act No. 10**: On or about July 5, 2006, the CEO

20 knowingly caused a materially false and misleading statement to be

21 made to KB's outside auditor in a management representation letter

22 dated July 5, 2006.

23         **Overt Act No. 11**: On or about July 6, 2006, in a meeting

24 with KB's deputy general counsel, the CEO asserted that he did not

25 believe that a disclosure of irregularities in KB's options granting

26 practice was necessary in KB's upcoming second quarter 10Q because

27 there was no backdating or other management impropriety at KB.

28

1         **Overt Act No. 12**: On or about July 7, 2006, the CEO

2 knowingly and willfully caused false and misleading statements to be

3 made in a report that was filed with the SEC, namely, KB's Quarterly

4 Report on Form 10Q for the 2nd quarter of 2006.

5         **Overt Act No. 13**: Between May and July 2006, defendant RAY

6 instructed HR personnel conducting a separate HR investigation into

7 KB's stock options process not to disclose the existence of HR's

8 investigation, or the data they collected, to any other departments

9 at KB, including KB's legal department, or to the subcommittee for

10 the Audit Committee.

11         **Overt Act No. 14**: In mid-July 2006, after consulting with

12 KB's CEO, defendant RAY requested a lower-level employee in KB's

13 legal department to hire a private investigator to have KB's deputy

14 general counsel followed.

15

16 THOMAS P. O'BRIEN
   United States Attorney

17 *Daniel S. Goodman*

18 DANIEL S. GOODMAN
   Assistant United States Attorney
   Deputy Chief, Criminal Division

19

20 DOUGLAS A. AXEL
   Assistant United States Attorney

21 Chief, Major Frauds

22

23 ALKA SAGAR
   Assistant United States Attorney
   Deputy Chief, Major Frauds

24

25 ALEXANDER A. BUSTAMANTE
   PAUL G. STERN

26 Assistant United States Attorneys
   Major Frauds Section

27

28