ORIGINAL

FILED

2008 DEC 15  PM 12: 37

[illegible stamp] DISTRICT COURT
[illegible] CALIF.
LOS ANGELES

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   PAUL G. STERN (Cal. State Bar # 162734)
4  ALEXANDER A. BUSTAMANTE (Cal. State Bar # 192373)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-0715/3176
        Facsimile: (213) 894-6269
8       Email: Paul.Stern@usdoj.gov
               Alex.Bustamante@usdoj.gov
9
   Attorney for Plaintiff
10 United States of America

11                 UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,     )  CR No. _____
                                  )          CR 08 01443
14                 Plaintiff,     )
                                  )  PLEA AGREEMENT FOR DEFENDANT
15           v.                   )  GARY RAY
                                  )
16  GARY RAY,                     )
                                  )
17                 Defendant.     )
                                  )
18                                )
    _____)

19

20       1.  This constitutes the plea agreement between Gary Ray

21  ("defendant") and the United States Attorney's Office for the

22  Central District of California ("the USAO") in the above-

23  captioned case.  This agreement is limited to the USAO and cannot

24  bind any other federal, state or local prosecuting,

25  administrative or regulatory authorities.

26                              PLEA

27       2.  Defendant gives up the right to indictment by a grand

28  jury and agrees to plead guilty to a single-count information in

1   the form attached to this agreement or a substantially similar
2   form.

3   <u>NATURE OF THE OFFENSE</u>

4      3.   In order for defendant to be guilty of single-count
5   information, which charges a violation of Title 18, United States
6   Code, Section 371, the following must be true:

7      First, beginning as early as mid-March 2006, and ending on
8   or about mid-August 2006, there was an agreement between two or
9   more persons to impede, obstruct or influence a contemplated
10   investigation of the Securities and Exchange Commission ("SEC"),
11   in violation of Title 18, United States Code, Section 1519;

12      Second, the defendant became a member of the conspiracy
13   knowing of at least one of its objects and intending to
14   accomplish it; and

15      Third, one of the members of the conspiracy performed at
16   least one overt act for the purpose of carrying out the
17   conspiracy.

18      In order to be guilty of a violation of Title 18, United
19   States Code, Section 1519, the following must be true:

20      First, defendant knowingly altered, destroyed, mutilated,
21   concealed, covered up, falsified, or made a false entry in any
22   record, document, and tangible object; and

23      Second, defendant acted with the intent to impede, obstruct,
24   or influence the investigation or proper administration of any
25   matter within the jurisdiction of the SEC, or acted in relation
26   to or in contemplation of such an investigation or administrative
27   matter of the SEC.

28      Defendant admits that defendant is, in fact, guilty of this

1  offense as described in the information.

2  <u>PENALTIES AND RESTITUTION</u>

3      4.  The statutory maximum sentence that the Court can impose
4  for a violation of Title 18, United States Code, Section 371 is:
5  5 years imprisonment; a 3-year period of supervised release; a
6  fine of $250,000 or twice the gross gain or gross loss resulting
7  from the offense, whichever is greatest; and a mandatory special
8  assessment of $100.

9      5.  Supervised release is a period of time following
10 imprisonment during which defendant will be subject to various
11 restrictions and requirements.  Defendant understands that if
12 defendant violates one or more of the conditions of any
13 supervised release imposed, defendant may be returned to prison
14 for all or part of the term of supervised release, which could
15 result in defendant serving a total term of imprisonment greater
16 than the statutory maximum stated above.

17     6.  Defendant also understands that, by pleading guilty,
18 defendant may be giving up valuable government benefits and
19 valuable civic rights, such as the right to vote, the right to
20 possess a firearm, the right to hold office, and the right to
21 serve on a jury.

22     7.  Defendant further understands that the conviction in
23 this case may subject defendant to various collateral
24 consequences, including but not limited to, deportation,
25 revocation of probation, parole, or supervised release in another
26 case, and suspension or revocation of a professional license.
27 Defendant understands that unanticipated collateral consequences
28 will not serve as grounds to withdraw defendant's guilty plea.

3

8. Defendant agrees to make restitution for losses specifically caused by defendant's activities in that defendant agrees to pay back to KB Home gains that defendant received from KB Home through the backdating stock options grants. The parties currently believe that the applicable amount of restitution based upon defendant's improperly received gains from backdating is approximately $353,425, an amount that may be subject to change through further analysis of the issues. The parties further agree that defendant may receive credit for repayment of these gains in connection with a pending civil settlement of claims against him by KB Home. Defendant further agrees that defendant will not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

<u>FACTUAL BASIS</u>

9. Defendant and the USAO agree and stipulate to the statement of facts attached hereto as Exhibit "A" and incorporated herein by reference. This statement of facts includes facts sufficient to support a plea of guilty to the charge described in this agreement and to establish the agreed upon sentencing guideline factors set forth in paragraph 12 below. It is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to defendant that relate to that conduct.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10. By pleading guilty, defendant gives up the following rights:

      a) The right to persist in a plea of not guilty.

      b) The right to a speedy and public trial by jury.

1    c) The right to the assistance of legal counsel at
2    trial, including the right to have the Court appoint counsel for
3    defendant for the purpose of representation at trial. (In this
4    regard, defendant understands that, despite his plea of guilty,
5    he retains the right to be represented by counsel - and, if
6    necessary, to have the court appoint counsel if defendant cannot
7    afford counsel - at every other stage of the proceedings.)

8    d) The right to be presumed innocent and to have the
9    burden of proof placed on the government to prove defendant
10   guilty beyond a reasonable doubt.

11   e) The right to confront and cross-examine witnesses
12   against defendant.

13   f) The right, if defendant wished, to testify on
14   defendant's own behalf and present evidence in opposition to the
15   charges, including the right to call witnesses and to subpoena
16   those witnesses to testify.

17   g) The right not to be compelled to testify, and, if
18   defendant chose not to testify or present evidence, to have that
19   choice not be used against defendant.

20   By pleading guilty, defendant also gives up any and all
21   rights to pursue any affirmative defenses, Fourth Amendment or
22   Fifth Amendment claims, and other pretrial motions that have been
23   filed or could be filed.

24                        SENTENCING FACTORS

25   11.  Defendant understands that the Court is required to
26   consider the United States Sentencing Guidelines ("U.S.S.G." or
27   "Sentencing Guidelines") among other factors in determining
28   defendant's sentence. Defendant understands that the Sentencing

1 Guidelines are only advisory, and that after considering the
2 Sentencing Guidelines, the Court may be free to exercise its
3 discretion to impose any reasonable sentence up to the maximum
4 set by statute for the crimes of conviction.

5      12.  Defendant and the USAO agree and stipulate to the
6 following applicable sentencing guideline factors:

7      Base Offense Level  :      14       U.S.S.G. § 2J1.2(a)

8      Specific Offense
       Characteristics:
9
       **Substantial
10     Interference with
       Administration of
11     Justice**          :      +3       U.S.S.G. § 2J1.2(b)(2)

12     **Extensive in Scope,
       Planning, or
13     Preparation**      :      +2       U.S.S.G. § 2J1.2(b)(3)

14     Adjustments

15     **Abuse of Position  :      +2       U.S.S.G. § 3B1.3
       of Trust**
16
       The USAO will agree to a downward adjustment for acceptance
17 of responsibility and, if applicable, move for an additional
18 level under § 3E1.1(b) only if the conditions set forth in
19 paragraph 15 are met.  Subject to paragraph 17(g) (relating to a
20 possible motion for a downward departure based on substantial
21 assistance), defendant and the USAO agree not to seek, argue, or
22 suggest in any way, either orally or in writing, that any other
23 specific offense characteristics, adjustments or departures, from
24 either the applicable Offense Level or Criminal History Category,
25 be imposed in determining defendant's total guidelines offense
26 level and guidelines sentencing range.  If, however, after
27 signing this agreement but prior to sentencing, defendant were to
28

                                    6

1  commit an act, or the USAO were to discover a previously
2  undiscovered act committed by defendant prior to signing this
3  agreement, which act, in the judgment of the USAO, constituted
4  obstruction of justice within the meaning of U.S.S.G. § 3C1.1,
5  the USAO would be free to seek the enhancement set forth in that
6  section.  In the event that defendant's offense level is so
7  altered, the parties are not bound by the adjusted offense level
8  stipulated to above.

9      13.  There is no agreement as to defendant's criminal
10 history or criminal history category.

11     14.  The stipulations in this agreement do not bind either
12 the United States Probation Office or the Court.  Both defendant
13 and the USAO are free to: (a) supplement the facts by supplying
14 relevant information to the United States Probation Office and
15 the Court, and (b) correct any and all factual misstatements
16 relating to the calculation of the sentence, although each party
17 agrees to maintain its view that the calculations in paragraph 12
18 are consistent with the facts of this case.

19                     DEFENDANT'S OBLIGATIONS

20     15.  Defendant agrees that he will:

21          a) Plead guilty as set forth in this agreement.

22          b) Not knowingly and willfully fail to abide by all
23 sentencing stipulations contained in this agreement.

24          c) Not knowingly and willfully fail to: (i) appear as
25 ordered for all court appearances, (ii) surrender as ordered for
26 service of sentence, (iii) obey all conditions of any bond, and
27 (iv) obey any other ongoing court order in this matter.

28          d) Not commit any crime; however, offenses which would

7

1  be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are
2  not within the scope of this agreement.

3  e) Not knowingly and willfully fail to be truthful at
4  all times with Pretrial Services, the U.S. Probation Office, and
5  the Court.

6  f) Pay the applicable special assessment at or before
7  the time of sentencing unless defendant lacks the ability to pay.

8  16. Defendant further agrees to cooperate fully with the
9  USAO, the Federal Bureau of Investigation ("FBI") and, as
10 directed by the USAO, any other federal agency, and state, or
11 local law enforcement agency.  This cooperation requires
12 defendant to:

13 a)   Respond truthfully and completely to all questions
14 that may be put to defendant, whether in interviews, before a
15 grand jury, or at any trial or other court proceeding.

16 b)   Attend all meetings, grand jury sessions, trials
17 or other proceedings at which defendant's presence is requested
18 by the USAO or compelled by subpoena or court order.

19 c)   Produce voluntarily all documents, records, or
20 other tangible evidence relating to matters about which the USAO,
21 or its designee, inquires.

22                    THE USAO'S OBLIGATIONS

23 17. If defendant complies fully with all defendant's
24 obligations under this agreement, the USAO agrees:

25 a) To abide by all sentencing stipulations contained in
26 this agreement.

27 b) At the time of sentencing, provided that defendant
28 demonstrates an acceptance of responsibility for the offense up

8

1  to and including the time of sentencing, to recommend a two-level
2  reduction in the applicable sentencing guideline offense level,
3  pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary,
4  move for an additional one-level reduction if available under
5  that section.

6       c) To recommend that defendant be sentenced at the low
7  end of the applicable Sentencing Guidelines range provided that
8  the total offense level as calculated by the Court is 18 or
9  higher and provided that the Court does not depart downward in
10 offense level or criminal history category (except pursuant to,
11 and to the extent requested in, a motion by the USAO for a
12 downward departure under U.S.S.G. § 5K1.1).  Notwithstanding its
13 agreement to recommend the low end of the Sentencing Guidelines
14 range, the USAO is free to recommend any conditions of
15 confinement, including imprisonment, if the total offense level
16 falls within Zone B or C of the sentencing table.

17      d) Not to offer as evidence in its case-in-chief in the
18 above-captioned case or any other prosecution that may be brought
19 against defendant by the USAO, or in connection with any
20 sentencing proceeding in any case that may be brought against
21 defendant by the USAO, any statements made by defendant or
22 documents, records, or tangible evidence provided by defendant
23 pursuant to this agreement, or pursuant to a letter agreement
24 dated October 6, 2008 (the "Letter Agreement"), which also
25 applied to meetings on the following dates: October 7, 8, 22 and
26 23, 2008.  Defendant agrees, however, that the USAO may use such
27 statements, documents, records, and tangible evidence: (1) to
28 obtain and pursue leads to other evidence, which evidence may be

9

1  used for any purpose, including any prosecution of defendant,
2  (2) to cross-examine defendant should defendant testify, or to
3  rebut any evidence, argument or representations made by defendant
4  or a witness called by defendant in any trial, sentencing
5  hearing, or other court proceeding, and (3) in any prosecution of
6  defendant for false statement, obstruction of justice, or
7  perjury.

8          e) Not to use any information provided by defendant
9  pursuant to this agreement against defendant at sentencing for
10 the purpose of determining the applicable guideline range,
11 including the appropriateness of an upward departure, and to
12 recommend to the Court that such information not be used in
13 determining the sentence to be imposed.  Defendant understands,
14 however, that information provided by defendant pursuant to this
15 agreement will be disclosed to the probation office and the
16 Court, and that the Court may use this information for the
17 purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the
18 sentence to be imposed.

19         f) In connection with defendant's sentencing, to bring
20 to the Court's attention the nature and extent of defendant's
21 cooperation.

22         g) If the USAO determines, in its exclusive judgment,
23 that defendant has both complied with his obligations under
24 paragraphs 15 and 16 above and provided substantial assistance to
25 law enforcement in the prosecution or investigation of another
26 ("substantial assistance"), to move the Court pursuant to
27 U.S.S.G. § 5K1.1 to fix an offense level and corresponding
28 guideline range below that otherwise dictated by the sentencing

1  guidelines, and to recommend a sentence within this reduced

2  range.

3      DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE

4      18.  Defendant understands the following:

5          a)  Any knowingly false or misleading statement by

6  defendant will subject defendant to prosecution for false

7  statement, obstruction of justice, and perjury and will

8  constitute a breach by defendant of this agreement.

9          b)  Nothing in this agreement requires the USAO or any

10 other prosecuting or law enforcement agency to accept any

11 cooperation or assistance that defendant may offer, or to use it

12 in any particular way.

13         c)  Defendant cannot withdraw defendant's guilty plea

14 if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1

15 for a reduced guideline range or if the USAO makes such a motion

16 and the Court does not grant it or if the Court grants such a

17 USAO motion but elects to sentence above the reduced range.

18         d)  At this time the USAO makes no agreement or

19 representation as to whether any cooperation that defendant has

20 provided or intends to provide constitutes substantial

21 assistance.  The decision whether defendant has provided

22 substantial assistance rests solely within the discretion of the

23 USAO.

24         e)  The USAO's determination of whether defendant has

25 provided substantial assistance will not depend in any way on

26 whether the government prevails at any trial or court hearing in

27 which defendant testifies.

28

11

## BREACH OF AGREEMENT

19.   If defendant, at any time between the execution of this agreement and the completion of defendant's cooperation pursuant to the agreement or defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, whichever is later, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.   For example, if the defendant knowingly in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes his own role, or the role of another, in criminal conduct, he will have breached this agreement.   If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, defendant will not be able to withdraw defendant's guilty plea, and the USAO will be relieved of all of its obligations under this agreement.   In particular:

    a)   The USAO will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty.

    b)   The USAO will no longer be bound by any agreements regarding criminal prosecution, and will be free to prosecute defendant for any crime.

    c)   The USAO will be free to prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

    d)   The USAO will no longer be bound by any agreement regarding the use of statements, documents, records, tangible

12

1  evidence, or information provided by defendant, and will be free
2  to use any of those in any way in any investigation, prosecution,
3  or civil or administrative action.  Defendant will not be able to
4  assert either (1) that those statements, documents, records,
5  tangible evidence, or information were obtained in violation of
6  the Fifth Amendment privilege against compelled self-
7  incrimination, or (2) any claim under the United States
8  Constitution, any statute, Rule 11(f) of the Federal Rules of
9  Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or
10 any other federal rule, that statements, documents, records,
11 tangible evidence, or information provided by defendant before or
12 after the signing of this agreement, or any leads derived
13 therefrom, should be inadmissible.
14      20.  Following a knowing and willful breach of this
15 agreement by defendant, should the USAO elect to pursue any
16 charge that was dismissed or not filed as a result of this
17 agreement, then:
18          a) Defendant agrees that any applicable statute of
19 limitations is tolled between the date of defendant's signing of
20 this agreement and the commencement of any such prosecution or
21 action.
22          b) Defendant gives up all defenses based on the statute
23 of limitations, any claim of preindictment delay, or any speedy
24 trial claim with respect to any such prosecution, except to the
25 extent that such defenses existed as of the date of defendant's
26 signing of this agreement.
27      LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK
28      21.  Defendant gives up the right to appeal any sentence

13

1   imposed by the Court, including any order of restitution, and the
2   manner in which the sentence is determined, provided that (a) the
3   sentence is within the statutory maximum specified above and is
4   constitutional, (b) the Court in determining the applicable
5   guideline range does not depart upward in offense level or
6   criminal history category and determines that the total offense
7   level is 18 or below, and (c) the Court imposes a sentence within
8   or below the range corresponding to the determined total offense
9   level and criminal history category.  Defendant also gives up any
10  right to bring a post-conviction collateral attack on the
11  conviction or sentence, except a post-conviction collateral
12  attack based on a claim of ineffective assistance of counsel, a
13  claim of newly discovered evidence, or an explicitly retroactive
14  change in the applicable Sentencing Guidelines, sentencing
15  statutes, or statutes of conviction.  Notwithstanding the
16  foregoing, defendant retains the ability to appeal the amount of
17  restitution ordered and the conditions of probation or supervised
18  release imposed by the court, with the exception of the
19  following: standard conditions set forth in district court
20  General Orders 318 and 01-05; the drug testing conditions
21  mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol
22  and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).
23      22.  The USAO gives up its right to appeal the Court's
24  sentence, provided that (a) the Court in determining the
25  applicable guideline range does not depart downward in offense
26  level or criminal history category (except by a downward
27  departure in offense level pursuant to, and to the extent
28  requested by, the USAO in a motion under U.S.S.G. § 5K1.1), (b)

14

1  the Court determines that the total offense level is 18 or above

2  prior to any departure under U.S.S.G. § 5K1.1, and (c) the Court

3  imposes a sentence within or above the range corresponding to the

4  determined total offense level (after any downward departure

5  under U.S.S.G. § 5K1.1) and criminal history category.

6                       COURT NOT A PARTY

7     23.   The Court is not a party to this agreement and need not

8  accept any of the USAO's sentencing recommendations or the

9  parties' stipulations.  Even if the Court ignores any sentencing

10  recommendation, finds facts or reaches conclusions different from

11  any stipulation, and/or imposes any sentence up to the maximum

12  established by statute, defendant cannot, for that reason,

13  withdraw defendant's guilty plea, and defendant will remain bound

14  to fulfill all defendant's obligations under this agreement.  No

15  one – not the prosecutor, defendant's attorney, or the Court –

16  can make a binding prediction or promise regarding the sentence

17  defendant will receive, except that it will be within the

18  statutory maximum.

19                NO ADDITIONAL AGREEMENTS

20     24.   Except as set forth herein, there are no promises,

21  understandings or agreements between the USAO and defendant or

22  defendant's counsel, aside from the aforementioned Letter

23  Agreement.  Nor may any additional agreement, understanding or

24  condition be entered into unless in a writing signed by all

25  parties or on the record in court.

26     PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

27     25.   The parties agree and stipulate that this Agreement

28  will be considered part of the record of defendant's guilty plea

1  hearing as if the entire Agreement had been read into the record

2  of the proceeding.

3       This agreement is effective upon signature by defendant and

4  an Assistant United States Attorney.

5  AGREED AND ACCEPTED

6  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA

7
   THOMAS P. O'BRIEN

8  United States Attorney

9     *Paul 6-St*                          12/12/08

10 PAUL G. STERN                          Date
   ALEXANDER A. BUSTAMANTE

11 Assistant United States Attorneys

12

13      I have read this agreement and carefully discussed every

14 part of it with my attorney.  I understand the terms of this

15 agreement, and I voluntarily agree to those terms.  My attorney

16 has advised me of my rights, of possible defenses, of the

17 Sentencing Guideline provisions, and of the consequences of

18 entering into this agreement.  No promises or inducements have

19 been made to me other than those contained in this agreement.  No

20 one has threatened or forced me in any way to enter into this

21 agreement.  Finally, I am satisfied with the representation of my

22 attorney in this matter.

23                                         12-10-08

24 GARY RAY                                Date
   Defendant

25

26      I am Gary Ray's attorney.  I have carefully discussed every

27 part of this agreement with my client.  Further, I have fully

28 advised my client of his rights, of possible defenses, of the

                                16

1  Sentencing Guidelines' provisions, and of the consequences of
2  entering into this agreement.   To my knowledge, my client's
3  decision to enter into this agreement is an informed and
4  voluntary one.
5
6  _____          _12/12/08_
   MARK E. BECK                        Date
7  Counsel for Defendant
   Gary Ray
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1                       <u>EXHIBIT A</u>

2                <u>United States v. Gary Ray</u>

3                <u>STATEMENT OF FACTS</u>

4   <u>Jurisdiction</u>

5      1.   KB Home ("KB") is a homebuilding company that was

6 founded in 1957.   KB is a Delaware corporation headquartered in

7 Los Angeles.   KB is currently a Fortune 500 company, trading on

8 the New York Stock Exchange as "KBH."

9      2.   At all times relevant to this plea agreement, GARY A.

10 RAY ("RAY") served as KB'S Senior Vice-President of Human

11 Resources ("HR") and was a corporate officer governed by Section

12 16 of the Securities Exchange Act of 1934.

13      3.   At all times relevant to this plea agreement, KB's

14 Chief Executive Officer and Chairman of the Board of Directors

15 ("the CEO") was a corporate officer governed by Section 16 of the

16 Securities Exchange Act of 1934.

17   <u>Background</u>

18      4.   From 1999 to 2005, the CEO and RAY managed KB's

19 compensation process, particularly as it related to stock

20 options.   Each year, they both briefed KB's Compensation

21 Committee ("Committee") on the amount of stock options to be

22 issued to KB's employees, recommending a specific number of

23 options for each high-ranking KB executive and a lump sum number

24 of options for the lower-level rank and file employees.

25      5.   From 1999 to 2001, the three-year period immediately

26 preceding the implementation of the Sarbanes-Oxley Act of 2002

27 ("SOX"), defendant RAY and the CEO would backdate the grant date

28 for KB's annual stock options.   Specifically, they would wait for

1   a period of approximately six weeks after the Committee's annual
2   option grant meeting in early October and then "look back"
3   approximately six weeks, proceeding as far back as the date of
4   the Committee meeting, in order to select a grant date for the
5   annual stock options to be issued to KB's employees.  The date
6   selected by the CEO and RAY was the date on which KB's closing
7   stock price was at its lowest point during the relevant time
8   period, that is, between the early October Committee date and the
9   mid-November date on which they looked back.  The exercise price
10  for KB's annual stock option grants was the closing price of KB's
11  stock on the date retrospectively selected by the CEO and RAY to
12  serve as the grant date of the options.

13      6.   By selecting the grant date for KB's annual stock option
14  grants retrospectively in this manner, the CEO and RAY secured
15  exercise prices for KB's options significantly lower than the
16  fair market value ("FMV") of KB's stock on the day they picked
17  the exercise price.  At the same time, by linking the exercise
18  price of KB's annual options to the closing price of KB's stock
19  on the grant date they selected with hindsight, the CEO and RAY
20  created the impression that the exercise price of KB's annual
21  stock options was the FMV of KB's stock "as of" the date the
22  options were actually granted.

23      7.   After SOX's passage in 2002, the CEO and RAY modified
24  their retrospective pricing process to deal with SOX's 48-hour
25  reporting requirement for Form 4s, which required the reporting
26  of equity awards to Section 16 officers within 48 hours of the
27  date of the award.  Instead of looking back to the lowest point
28  in a prior six week time period, they started using a two-day

1  rolling window to select a low grant price.  Using this method,
2  the CEO and RAY would routinely monitor fluctuations in KB's
3  stock during the month of October on a going-forward basis and,
4  after concluding they had found the likely lowest price trough
5  during this period, they would look back either one or two days
6  to select the grant date with the lowest price within this
7  floating two-day window.  The CEO made the final decision in
8  selecting the grant date to be used in accordance with this
9  method.

10     8.   The purpose of this modified hindsight pricing process
11 remained the same as that of the CEO's and RAY's pre-SOX process,
12 namely, to price KB's annual option grants below the FMV of KB's
13 stock at the time of the option grant by selecting earlier grant
14 dates with lower closing prices, while at the same time creating
15 the impression that the exercise price of KB's stock options was
16 the FMV of KB's stock "as of" the date the options were actually
17 granted.

18     9.   The CEO instructed RAY that they did not need to
19 disclose their adoption of the procedure of using retrospective
20 pricing to select favorably-low, historical grant dates to KB's
21 Compensation Committee.

22     KB Home's Internal Investigation

23     10.  Beginning in March of 2006, the Wall Street Journal
24 ("WSJ") and other newspapers began writing stories about options
25 backdating scandals occurring at various publicly-traded
26 companies.  These articles generally explained, among other
27 things, that backdated options created certain accounting and tax
28 consequences for companies.  In addition, many of these articles

1  disclosed that various federal agencies, including the Securities
2  and Exchange Commission ("SEC") and the Department of Justice
3  ("DOJ"), were investigating various companies for options
4  backdating and for causing inaccurate reporting statements, such
5  as annual Form 10Ks and quarterly 10Qs, to be filed with the SEC.
6      11.   Toward the end of May 2006, the head of KB's Audit
7  Committee contacted the CEO and requested an internal
8  investigation into whether KB had any problems with its options
9  granting process.  It was understood that any results from this
10  investigation were to be delivered to the Audit Committee, and
11  that these results were likely to be taken into account by KB's
12  Board and KB's management in determining whether any public
13  disclosures with the SEC regarding irregularities in KB's options
14  granting practices were required.
15      12.   KB's Chief Legal Counsel ("CLO") conducted this
16  internal investigation.  When investigating KB's historical
17  options practices, the CLO sought information from both RAY and
18  the CEO.  The CLO requested documents from RAY, and asked both
19  RAY and the CEO to submit to a series of interviews concerning
20  KB's stock options process.
21      13.   Before the CEO and RAY interviewed with the CLO on or
22  about May 30, 2006, the CEO indicated to RAY that their prior
23  backdating practices could not be revealed to the CLO.  The CEO
24  and RAY both agreed that if this internal investigation was not
25  controlled, it could evolve into an independent investigation
26  that could possibly lead to, among others things, an SEC
27  investigation, a consequence that had already been publicly
28  reported at a number of other companies.  Therefore, the CEO and

21

1 RAY jointly developed an "innocent," and inaccurate, explanation
2 for the stock option grant process that did not disclose RAY's
3 and the CEO's retrospective pricing practices.
4     14.   In May and June of 2006, the CEO and RAY made
5 statements to the CLO about KB's stock option grant process.
6 When the CEO and RAY described the stock option grant process to
7 the CLO, they made a series of false statements.  Both men
8 falsely denied pricing stock options with hindsight or otherwise
9 manipulating the option-granting process to secure favorably low
10 exercise prices for KB's annual option grants.  In fact, the CEO
11 and RAY told the CLO that the stock options were priced only
12 after they determined how the block of stock options awarded by
13 the Committee for a given year to KB's lower-level employees
14 would be allocated to these employees, a process otherwise known
15 as the "allocation process."  The CEO and RAY also falsely stated
16 that, after this allocation process was completed, the grant
17 dates were mechanically determined on a going forward basis,
18 either immediately or within a relatively short window of time.
19 Further, the CEO and RAY failed to disclose to the CLO that they
20 had never sought nor received authorization from the Committee to
21 select option grant dates through the use of retrospective
22 pricing, and that they had never briefed the Committee on the
23 manner in which they selected the grant dates for KB's annual
24 options.
25     15.   Both the CEO and RAY knew that the statements they
26 provided to the CLO were false in that the selection of grant
27 dates for the stock options was wholly price-driven, based on
28 their use of hindsight to pick low price points for KB's stock,

22

1 and had nothing to do with completing the allocation process.
2 The CLO relied substantially on these false interview statements
3 from the CEO and RAY in drafting his investigative report, and
4 both the CEO and RAY knew that the CLO's report was based in
5 large measure on their false account of KB's option-granting
6 process.

7     16.  When writing his investigative report, the CLO sent
8 drafts for the CEO and RAY to review.  Neither the CEO nor RAY
9 corrected the false statements in the report.  When the final
10 report was completed, it stated categorically that there was no
11 backdating at KB and that historically low grant prices were the
12 result of an essentially price-neutral, administrative process,
13 not the result of any inappropriate cherry-picking of
14 historically low grant dates.

15     17.  This report was submitted to KB's Audit Committee,
16 which in reliance on it and in consultation with KB's Chief
17 Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and
18 CEO, decided that there was no serious backdating issue at KB.
19 Ray was aware that, in reliance on the CLO's inaccurate report,
20 KB filed a 2nd Quarter Form 10Q with the SEC on July 7, 2006 that
21 did not disclose any backdating problems affecting the company.

22     18.  Ray was aware that, based upon the CLO's report, the
23 Audit Committee members believed that KB was not required to make
24 any disclosure about its internal investigation or the fact that
25 KB may have repeatedly reported inaccurate information about its
26 stock-option equity awards in previously-filed 10K and 10Qs.
27 Accordingly, Ray was aware that the BOD, the Audit Committee, the
28 CLO and the CFO concurred with the filing of the second quarter

1  10Q based in part on the misleading facts in the CLO's report.

2       19.   In causing the CLO to prepare and submit a false
3  report of KB's historical option-granting practices, the CEO and
4  RAY caused a false record or document to be created that
5  concealed and covered up KB's actual option granting process, and
6  they did so with the understanding that the SEC was scrutinizing
7  and investigating such practices, and with the intent of
8  impeding, obstructing or influencing such an investigation, which
9  is a matter falling within the jurisdiction of the SEC.

10      20.   In furtherance of the conspiracy to obstruct justice
11 described above, a number of overt acts were committed by the CEO
12 and RAY, including, among others, overt acts 1-6 and 12-14, as
13 described in the Information attached to this plea agreement.

14      21.   The CEO's and RAY's false statements during the
15 internal investigation led to the expenditure of substantial
16 governmental resources, including a subsequent lengthy SEC and
17 DOJ investigation into stock option backdating at KB between 2006
18 and 2008 that required the deployment of extensive investigatory
19 resources over a period of nearly 20 months.

20      22.   RAY's actions were extensive in scope, planning, and
21 preparation.   Along with the CEO, RAY manipulated KB's internal
22 investigation into options backdating by (i) controlling access
23 to stock option information, (ii) providing misleading and false
24 information to KB's CLO during his internal investigation into
25 stock options backdating, and (iii) constantly reassuring members
26 of KB's management that there was no options backdating at KB.

27 / /

28 / /

24

1    23.  Defendant RAY was the Senior Vice President of Human
2    Resources and therefore held a position of public trust with
3    respect to KB's shareholders.  Defendant used his position to
4    facilitate the commission and concealment of stock option
5    backdating at KB.

6

7        I have read this statement of facts and carefully discussed
8    every part of it with my attorney, Mark E. Beck.  I stipulate and
9    agree that the statement of facts is accurate and correct, and
10   constitutes a factual basis for the entry of a plea of guilty to
11   violating 18 U.S.C. § 371, as well as the sentencing enhancements
12   stipulated to in my plea agreement.

13

14   _____          12·10·08
15   GARY RAY                              Date
     Defendant

16

17        I am the attorney representing Gary Ray.  I have carefully
18   discussed every part of this statement of facts with my client
19   and agree that it constitutes a factual basis for my client's
20   guilty plea to one count of violating 18 U.S.C. § 371, as well as
21   the sentencing enhancements stipulated to in his plea agreement.
22

23   _____          12/12/08
24   MARK E. BECK, Esq.                    Date
     Orrick, Herrington & Sutcliffe LLP
25
     Attorney for defendant GARY RAY
26

27

28

                              25